Judgment rendered February 5, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,432-JAC

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA
IN THE INTEREST OF
J.D.

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Bossier, Louisiana
Trial Court No. J-14,842

Honorable Michael Owen Craig, Judge

* * * * *

| | |
|---|---|
| TWENTY-SIXTH JUDICIAL DISTRICT PUBLIC DEFENDERS OFFICE By: Laurie Richardson Wilson | Counsel for Appellant, F.D.H., Mother |
| ACADIAN LEGAL SERVICES OF LOUISIANA By: Jerry W. Deason, Jr. | Counsel for Appellee, J.D., Minor Child |
| JOHN MICHAEL LAWRENCE WILLIAM MATTHEW ALTIMUS | Counsel for Appellee, State of Louisiana |
| KIMBERLY S. SMITH | Counsel for Appellee, State of Louisiana DCFS |

* * * * *

Before PITMAN, GARRETT, and COX, JJ.

**COX, J.**

F.D.-H. appeals a judgment of the Twenty-Sixth Judicial District Court, Parish of Bossier, State of Louisiana, terminating her parental rights to her minor child, J.D. For the following reasons, we affirm the district court's judgment.

## FACTS

On December 11, 2010, J.D. entered foster care due to "dependency" by his biological mother. On December 15, 2010, he was placed in the certified foster home of F.D.-H. On September 10, 2012, F.D.-H. adopted J.D. after 2 years of fostering him. J.D. was three at the time. According to F.D.-H., as early as the age of three or four, J.D. began to simulate masturbation at daycare. F.D.-H. claimed that by the age of five or six, J.D. was going under tables in the cafeteria looking under dresses of women. From November 12-16, 2016, J.D. was hospitalized at Longleaf Hospital in Alexandria, Louisiana. F.D.-H. reported that J.D. was physically violent toward her five-year-old niece and exhibited sexual aggression toward males and females. At this time J.D. received homebound services due to the severity of his condition. From January 5, 2017 to January 12, 2017, J.D. received treatment again at Longleaf for homicidal thoughts. He was diagnosed with intermittent explosive disorder and conduct disorder, childhood onset.

On January 30, 2017, F.D.-H. placed J.D. in the Methodist Children's Home of Greater New Orleans. On May 3, 2017, the facility deemed J.D. ready for discharge. F.D.-H. refused to pick up her son because he allegedly called her and expressed homicidal tendencies toward her. The Methodist Children's Home decided to push back J.D.'s removal until June 13, 2017.

F.D.-H. still refused to pick up J.D. from the Methodist Children's Home, and as a result, J.D. went into the custody of DCFS. On June 20, 2017, the Methodist Children's Home documented that J.D. no longer met medical necessity criteria for treatment due to lack of guardian involvement and turned him over to DCFS. On July 3, 2017, DCFS filed an affidavit in support of an instanter order in Bossier Parish Juvenile Court alleging that F.D.-H. was afraid of her child. On July 17, 2017, a rule to show cause was held and F.D.-H. received custody of J.D. again. From August 17, 2017 to October 30, 2017, F.D.-H. placed J.D. in Crescent Pines Hospital in Georgia for homicidal thoughts. Later, F.D.-H. claimed that J.D. was sexually assaulted while in treatment.

On February 23, 2018, DCFS received a report from R.H., F.D.-H.'s neighbor, that J.D. was being emotionally abused by F.D.-H. As a result, DCFS Worker Maurice Watkins opened an investigation into F.D.-H. Watkins stated that there was concern J.D. was being emotionally abused by his mother and it was resulting in observable and substantial impairment of the child's psychological and emotional well-being. He pointed out that because the child had been pulled from school, there were no statements from educators indicating how the child was doing in school. Watkins then cited to a report written by Dr. Perry Hill. Though the actual report is not in the record, Watkins wrote that Dr. Hill believed that J.D. was suffering from maltreatment by his adoptive mother. According to Dr. Hill, the child would become stabilized outside of his mother's care, but once he returned home, the mother continuously reminded J.D. of his past traumas and he would begin to spiral.

2

Watkins also wrote that Georgia police had investigated the sexual assault allegation and J.D. had been through a forensic interview. The interviewer recommended that J.D. go through follow-up counseling sessions at the CARA Center in Shreveport. J.D. attended only two such sessions and in one of them, F.D.-H. forced J.D. to sit through the session after he had urinated on himself.

In conjunction with DCFS' investigation, Aaron Phillips, a CPS worker from Ouachita Parish, conducted interviews of J.D.'s former teachers, F.D.-H., J.D., a former psychiatrist, F.D.-H.'s oldest daughter, and a forensic interviewer.

First, Phillips spoke with Janice Williams, an educator at the school J.D. attended from 2015-2017. Dr. Williams stated that F.D.-H. informed her of J.D.'s hypersexual behavior as well as his various medical diagnoses. Dr. Williams described J.D. as a very respectful and intelligent gentleman. She acknowledged that he is at times dishonest, particularly when dealing with his grades. Dr. Williams believed that F.D.-H. can fabricate stories and come up with "far-fetched things." She believed that her last conversation with F.D.-H. was rehearsed.

Next, Phillips and his supervisor interviewed F.D.-H. and J.D. individually. F.D.-H. reiterated her early claims that J.D. was hypersexual, abused, and showed homicidal tendencies against her six-year-old niece. J.D. admitted that he wore pull-ups because he urinates on himself, both on accident and on purpose. He also told Phillips that he wanted to suck other men's privates. He admitted that he had thoughts of killing other men and stated that he was sexually assaulted in Georgia. During the interview with J.D., Phillips noted that initially J.D. behaved like a normal nine-year-old

3

boy. But, when F.D.-H. entered the home to search for a piece of paper, J.D.'s behavior changed. He immediately started to exhibit the hypersexual characteristics that F.D.-H. claimed J.D. had. Once F.D.-H. entered the home, she forced J.D. to remain by her side during the remainder of the interview.

Phillips also spoke with Dr. Gregory Brown, a psychiatrist who saw J.D. once as a private patient. Dr. Brown did not believe this to be a case of Munchausen. He stated that J.D. needed inpatient treatment due to his homicidal tendencies and vivid description of sexual acts he wished to perform on men.

Phillips then spoke with Cheryl Moore from AETNA. Moore stated that her department had called DCFS on F.D.-H. for failing to pick up J.D.'s prescription. She stated that she believed this to be a case of Munchausen disorder.

Phillips spoke with F.D.-H.'s oldest daughter, K.D., who babysat J.D. for her mother. She verified her mother's statements regarding J.D.'s homicidal tendencies.

Phillips also interviewed Heather Strickland from the Gingerbread House in Shreveport, Louisiana. Strickland stated that on December 5, 2017, J.D. showed up for a forensic interview wearing clothes in which he had urinated. Strickland wanted to speak with J.D. about the sexual assault allegation in Georgia. Due to J.D. urinating in his pants, Strickland decided to reschedule the interview for January 4, 2018. On that day, F.D.-H. and J.D. showed up, but F.D.-H. decided that she did not want to proceed with the interview.

Phillips' final interview was with Jessica Feeback, J.D.'s at-home teacher. Feeback stated that she was not aware of any issues with F.D.-H. and believed her to be an excellent foster mom. Feeback stated that she had seen F.D.-H. raise several other foster children with much success.

On May 18, 2018, Watkins interviewed F.D.-H., Officer Chad Johnson, Feeback, and J.D. F.D.-H. reiterated her earlier claims. She also stated that J.D. had a meeting with Dwayne Williams, a counselor with Choice Counseling. After one session, F.D.-H. stated that Williams could not provide the help J.D. needed. She did not take him back to Choice Counseling. She claimed that DCFS "hates her guts" because she loaned an agency worker $100 and the worker refused to pay her back.

Next, Watkins spoke with Officer Johnson. He stated he did welfare checks because he has been called to the house several times. In a second interview, Johnson said that he tried to develop a relationship with J.D. and fears that J.D. may one day hurt F.D.-H.

Watkins then spoke with Ms. Feeback. She stated that she had attempted to meet with J.D. for his homebound lessons but had only been able to meet for three of the scheduled 14 sessions because F.D.-H. cancelled the other sessions. She stated that F.D.-H. claimed J.D. masturbates during the lessons. Feeback said that she was unaware of such things, though J.D. confessed to Feeback that he did this. At the time of the interview, Feeback was looking for a place where she felt comfortable enough to meet with J.D. Feeback said that she is heartbroken over the situation. She described F.D.-H. as a shell of herself and expressed fear that J.D. may harm her or others in the house.

5

Based on this information, the district court granted an instanter order placing J.D. in the temporary custody of DCFS. On July 6, 2018, the State filed a petition to have J.D. declared a child in need of care, which was granted. As a result, DCFS placed J.D. in foster care in Natchitoches and gave F.D.-H. a case plan to work in order to be reunified with J.D. As a part of her case plan, F.D.-H. was expected to: 1) maintain safe and stable housing; 2) maintain a legal source of income; 3) provide parental support of $155 a month; 4) keep the agency informed of her whereabouts; 5) participate in a psychological evaluation and follow recommendations; 6) participate in counseling; 7) release information prepared by service providers; and, 8) participate in family counseling. Initially, F.D.-H. received supervised visits twice a month with J.D. However, supervised visits were suspended as of August 1, 2018, pending a psychological review from Dr. John Simoneaux. DCFS agreed to provide weekly updates from J.D. to F.D.-H. After one of the last supervised visits, F.D.-H. called the police and stated that her son had told her he had sex during a sleepover at his foster home. DCFS investigated this and in a Gingerbread interview, J.D. stated that this did not happen.

F.D.-H. met with Dr. Simoneaux on September 18 and October 31, 2018. On December 21, 2018, Dr. Simoneaux rendered a report, which recommended that F.D.-H. not have in-person visits with J.D. for another six months. He believed that many of J.D.'s abnormal behaviors would subside after that. Dr. Simoneaux believed that if these behaviors did subside, then reunification would not be in J.D.'s best interest. F.D.-H. was not allowed to have supervised visits but could write letters or call J.D., which she chose not to do. Additionally, F.D.-H. failed to make any of the parental support

6

payments.  In the fall of 2018, J.D. attended school in Natchitoches Parish, where he was slowly reintegrated as a full-time student.  Additionally, J.D. made the "A" honor roll and was placed into the gifted program.  J.D. continued to attend therapy through Guidance Through Life Counseling Center.  During this time, J.D. consistently stated that he did not want to live with F.D.-H. but instead wanted to live with his former neighbor R.H. on a permanent basis.  During this time, R.H. and his wife began the process of becoming foster parents with the intention to eventually adopt J.D.  In June of 2019, DCFS place J.D. in R.H.'s home.

Based on J.D.'s continued improvement, R.H. and his wife's willingness to adopt J.D., and F.D.-H.'s unwillingness to work her case plan, the State moved to terminate F.D.-H.'s parental rights.  The trial took place on September 23, 2019.

First, F.D.-H. testified.  During her testimony, she admitted to not working the case plan.  She claimed that she refused to do so because it was biased and the entire process was unconstitutional.  She refused to go to counseling because she was not the reason that J.D. had his issues and the counselors wanted to blame her.  She also pointed to her independent psychological evaluation from Dr. Lionel Gillaume as evidence that she did not need psychological counseling.  In his independent report, Dr. Gillaume stated that he did not believe that F.D.-H. needed counseling.  She agreed that she did not pay the parental support.  She reasoned that since she no longer received a check for $520 from Social Security for J.D., she did not need to send any more money.  F.D.-H. explained that she never agreed with the case plan even though she initially signed it.  When asked about her finances, F.D.-H. stated she received an additional $371 per month for

7

adopting J.D., $1100 a month for spousal support from a divorce, and money for disability for a suspected cancer diagnosis. She also mentioned the loan that she had previously given a DCFS worker and how she believed this entire incident stems from this loan. She disputed any claims that she was isolating J.D. She claimed that her neighbor, R.H., used to watch J.D. on the weekends. But, after J.D. told her that R.H. let him watch porn, she would not allow J.D. to go to his house. She asserted that this is why R.H. reported her for negligence. She further asserted that she had not seen J.D. since July of 2018 because DCFS or "the agency" is working against her.

Next, the State called Jessica Smith, J.D.'s DCFS case manager. Smith testified that F.D.-H. had not been compliant with her case plan. She also testified about F.D.-H.'s claim that J.D. was sexually active in his foster home. She said that during the supervised visit, F.D.-H. first requested to meet with J.D. alone. After this request was denied, she later said that Smith needed to call the police. When Smith asked why, F.D.-H. left the building and called them herself. When police arrived, F.D.-H. told police that J.D. had whispered to her that he had sex with a boy in his foster home. During the trial, Smith testified that J.D. was not left alone with F.D.-H. So, J.D. would not have had time to tell F.D.-H. about such an incident without Smith hearing it. She also pointed to a Gingerbread interview in which J.D. said that his mother fabricated the incident.

Smith then testified about J.D.'s current emotional state. She told the district court that J.D.'s counseling sessions have lessened in frequency due to his success. Additionally, she asserted that J.D. is no longer on any medication and he is successful in school. He has been so successful that he has been moved into a gifted and talented classroom. She confirmed that

8

R.H. and his wife are a good placement for J.D. and that they would make excellent adoptive parents. She affirmed that J.D. had not displayed any highly sexualized behavior, homicidal tendencies, or any unusual behavior since being placed in foster care. Finally, Smith explained that while DCFS suspended F.D.-H.'s visitation, she could have sent him letters as a form of communication. Smith stated that F.D.-H. has not sent letters, money, or birthday gifts to J.D. since July of 2018.

Next, R.H. testified. He stated that he initially contacted DCFS about J.D. because he noticed that F.D.-H. isolated J.D. He said that he noticed that J.D. was terrified of F.D.-H. and he felt that something was amiss. R.H. used to keep J.D. for the weekends and served as a mentor for J.D. He disputed F.D.-H.'s claim that he allowed J.D. to watch pornography on the weekends and he was no longer allowed to see J.D. He echoed Smith's claims that J.D. was successful in school. R.H. stated that he and his wife had been through foster training with the desire to adopt J.D., despite their advanced age and the fact that they had already raised one child to adulthood.

F.D.-H. called her oldest son, J.S., to testify. J.S. testified that F.D.-H. had adopted him when he was 17 and provided him with a loving home. He said that he lived with F.D.-H. and J.D. in 2014 and 2015. He claimed that he never saw any of the sexual behavior that F.D.-H. described and only saw J.D. steal things occasionally. He reiterated that F.D.-H. was an excellent mother and was confused why there would be allegations of her being a bad mother.

Finally, J.D.'s attorney, Jerry Deason, made a statement on J.D.'s behalf. He stated that J.D. is a different child from when he first came into

9

the system.  He stated that in their first meeting J.D. told Deason that he wanted to suck his penis.  Recently, J.D. apologized to Deason and explained that his mother had forced him to say those things and that he was scared to be placed back with F.D.-H. because she will force him to sleep on the floor or not allow him to eat food.  Deason claimed that J.D. is 100% adamant that he does not want to see F.D.-H. ever again and wants to live with R.H.

After hearing all of the testimony and listening to closing arguments, the Judge stated: 1) the State had shown that J.D. had been removed from F.D.-H.'s home for over a year; 2) the child had been adjudicated a child in need of care; 3) F.D.-H. failed to comply with the case plan because she failed to provide financial support to the child, go to court-ordered therapy sessions, or follow any of the recommendations of the evaluator, Dr. Simoneaux; 4) F.D.-H. had shown she will continue to ignore the case plan; and, 5) it was in the best interest of J.D. to terminate F.D.-H.'s parental rights.  He also stated that F.D.-H. had the opportunity over the past year to communicate with J.D. via phone calls and simply did not.  The Judge recognized some validity to F.D.-H.'s argument she no longer received $520 as a monthly payment to J.D., but pointed out that it was never "her" money, it was explicitly money for J.D. from the federal government and as such, it does not count as payments from her toward J.D.  Therefore, the Judge terminated F.D.-H.'s parental rights.  F.D.-H. now appeals.

**DISCUSSION**

F.D.-H. argues that the State failed to meet its burden of proof because: 1) she had already taken steps to complete her case plan; 2) she had no intention of permanently abandoning J.D.; 3) she was capable of

10

completing her case plan if given the time to do so; and, 4) it was not in the best interest of J.D. to terminate F.D.-H.'s parental rights.

The State argues that the district court was not manifestly erroneous in terminating F.D.-H.'s parental rights. The State claims that F.D.-H. abandoned J.D. and openly admitted that counseling was required but failed to attend these meetings. The State maintains that F.D.-H.'s own testimony shows a clear refusal to work the case plan. Further, the State contends that the district court's ruling was in J.D.'s best interest. It points to J.D.'s remarkable recovery since being removed from the home of F.D.-H. as proof of such.

The termination of parental rights involves a two-pronged inquiry. First, the State must establish the existence of at least one ground for termination under La. Ch. Code art. 1015. If a ground for termination is found, then the trial court must determine whether the termination is in the best interest of the child. *State in Interest of C.F.*, 2017-1054 (La. 12/6/17), 235 So. 3d 1066.

Because the termination of parental rights is a severe and terminal action, the legislature has mandated that in order to terminate these rights, the State must satisfy an onerous burden of proof. *State in Interest of T.A.G.*, 52,722 (La. App. 2 Cir. 4/10/19), 269 So. 3d 1159; *State ex rel. B.H. v. A.H.*, 42,864 (La. App. 2 Cir. 10/24/07), 968 So. 2d 881. Proof by clear and convincing evidence requires a showing that the existence of the disputed fact is highly probable, meaning more probable than its nonexistence. *State in Interest of T.A.G.*, *supra*; *State in Interest of C.E.K.*, 2017-0409 (La. App. 4 Cir. 12/21/17), 234 So.3d 1059, *writ denied*, 2018-0143 (La. 3/9/18), 237 So.3d 523. Even upon finding that the State has met

11

its evidentiary burden, a court should not terminate parental rights unless it determines that termination is in the child's best interest. La. Ch. C. art. 1037(B).

In a proceeding for termination for parental rights, the issue of parental compliance with a case plan, the parent's expected success of rehabilitation, and the expectation of significant improvement in the parent's condition and conduct are questions of fact. An appellate court cannot set aside a trial court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. *State in Interest of C.R.F.*, 52,912 (La. App. 2 Cir. 7/17/19), 278 So. 3d 435; *State in Interest of M.L.H.*, 51,956 (La. App. 2 Cir. 1/10/18), 247 So. 3d 929.

*F.D.-H. Abandoned J.D.*

F.D.-H. first argues that the State failed to prove that she abandoned J.D. within the meaning of La. Ch. C. art. 1015(5). We disagree. La. Ch. C. art. 1015 lists the grounds for termination of parental rights. Specifically, La. Ch. C. art. 1015(5) lists abandonment as grounds for termination of parental rights. La. Ch. C. art. 1015(5)(b) and (c) define abandonment:

> (5) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
>
> > (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.
> >
> > (c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

12

F.D.-H. asserts that the record shows that she had no intention to permanently avoid parental responsibilities. She claims the only reason she did not maintain visitation with her son was because DCFS used the court system to prevent her from seeing her son in an effort to destroy the family ties. We find this argument to be without merit.

While the record does indicate that DCFS ceased supervised visits after July of 2018, F.D.-H. still could have sent her son letters, contacted him via phone, or given him small tokens of affection to maintain a connection with J.D. Yet, F.D.-H. did none of these things. In fact, by the time of the trial, J.D. had spent two birthdays without receiving a single letter, birthday gift, or phone call from his mother.

Furthermore, F.D.-H. failed to provide any financial contributions to J.D. even though she had sources of income. According to the record, F.D.-H. failed to make a single monthly payment to J.D. When questioned about this, she claimed that her loss of a social security benefit should count as a monthly payment to J.D. At trial the Judge properly dispensed with this argument, stating:

> The fact that you did not make any financial effort to provide any contribution towards the child I can almost see your argument in so much as you felt like that because the State was receiving the social security benefits that you didn't need to pay anything towards that contribution. The problem with your analogy is the $520 you keep saying was mine, was mine, it was coming from me. It was never coming from you. It was coming from the Social Security Administration. It was coming from the federal government. It was money that was coming from the tax payers of the United States; never from you… It was always meant for [J.D.'s] benefit so it was never your money to start with so it was never attributed to you as contribution for the benefit of [J.D.].

The simple truth is that F.D.-H. failed to communicate with J.D. and failed to make any contribution to J.D. for well over six months. As such, F.D.-H. abandoned J.D. as defined in La. Ch. C. art. 1015(5).

*F.D.-H. Failed to Comply with Her Case Plan*

Next, F.D.-H. claims that she had substantially complied with her case plan and, if given enough time, would have complied with the rest. Under La. Ch. C. art. 1015(6), parental rights may be terminated:

> Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Under 1015(6) the State had to prove three elements: 1) it had been one year since J.D. had been removed; 2) F.D.-H. had not substantially complied with the case plan for services; and, 3) there was no reasonable expectation of significant improvement in F.D.-H.'s condition or conduct in the near future. *See State in the Interest of A.L.D.*, 2018-1271 (La. 1/30/19), 263 So. 3d 860.

La. Ch. C. art. 1036(C) states that lack of parental compliance with a case plan may be evidenced by one or more of the following:

> (1) The parent's failure to attend court-approved scheduled visitations with the child.
> (2) The parent's failure to communicate with the child.
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

14

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

Here, F.D.-H. failed to comply with her case plan. As a part of her case plan, F.D.-H. was expected to: 1) maintain safe and stable housing; 2) maintain a legal source of income; 3) provide parental support of $155 a month; 4) keep the agency informed of her whereabouts; 5) participate in a psychological evaluation and follow recommendations; 6) participate in counseling; 7) release information prepared by service providers; and, 8) participate in family counseling. F.D.-H. contends that she maintained safe and stable housing, maintained a legal source of income, and participated in a psychological evaluation. As such, she argues that she substantially complied with her case plan. We are not swayed by this argument. While it is true she attended the psychological evaluation and it was not disputed that her home was in working condition (though according to the record, social workers were unable to actually visit her home due to their issues working with F.D.-H.), F.D.-H. refused to attend any counseling sessions or make a single payment of parental support. During her testimony, F.D.-H. openly acknowledged that she did not attend counseling sessions, claiming that she did not need counseling. F.D.-H.'s failure to pay parental support and attend court-mandated counseling sessions are indicative of a failure to work her case plan.

Furthermore, F.D.-H. expressed to the court that she had no interest in working her case plan in the near future. During her testimony F.D.-H. was asked her if she would ever attend counseling. She said:

> Well I'm not gonna say I said I will not do it. I said that I'm not gonna have counseling for causing harm to my son. Now if you wanted me to go counseling because I adopted a kid from DCFS with issues we can do that, but I'm not gonna go saying that I caused my son harm.

Ch. C. art. 1036(D) provides that under Article 1015(6), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

> (1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
> (2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
> (3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

After reviewing the record, we find that F.D.-H. shows a pattern of behavior that appears contradictory to one who desires to have her child returned home. During her own testimony she admitted that she had not worked portions of the case plan and actually stated that she would not do certain parts of her plan. F.D.-H. argues that because she went through a two-day psychological evaluation and sought an independent psychological review from Dr. Gillaume, she has shown an intent to make changes to regain custody. However, her own testimony indicates F.D.-H. is not willing to do what the district court found necessary for her to regain custody. F.D.-H.

seems to be willing to work parts of her case plan that are either convenient for her or do not assign any blame to her. She is quick to point to a report from Dr. Gillaume who appears to believe she is not in need of counseling, but ignores any other professionals who believe she does need counseling or believe that she is responsible for J.D.'s alleged conditions. F.D.-H. has consistently rejected doing parts of her plan that may assign blame to her (like going to counseling weekly) or may be inconvenient (like paying parental support). As such, F.D.-H. has failed to comply with her case plan.

*The District Court Acted in the Best Interest of J.D.*

Finally, F.D.-H. claims that the State failed to act in the best interest of the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parent to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest of the child, including the termination of parental rights if justifiable grounds exist and are proven. *State ex rel. S.M.W.*, 2000-3277 (La. 02/21/01), 781 So. 2d 1223; *State in Interest of S.A.T.*, 49,143 (La. App. 2 Cir. 5/14/14), 141 So. 3d 816.

When J.D. first entered DCFS' care, F.D.-H. claimed he had exhibited hypersexual and homicidal tendencies. She claimed that he urinated on himself frequently and needed serious psychological help. J.D. has spent much of his early life in and out of hospitals and on medications for mental issues F.D.-H. believed he had. He was not allowed to attend school at his mother's behest, for she believed that he was a danger to the students in the classroom. At trial, the district court heard from his social worker, J.D.'s attorney, and his new adoptive father. All three spoke of tremendous

17

successes that J.D. is having now that he is apart from F.D.-H. J.D. is no longer on medications, his meetings with a counselor have been reduced to an as-needed basis, and he is completely reintegrated into school. At the end of the trial, J.D.'s attorney, Jerry Deason, spoke on behalf of J.D. and provided the clearest description of what was in the best interest of J.D.

> Your honor, uh, [J.D.]—the first day I met [J.D.] um, in- in a personal environment was a couple of year ago uh, at a meeting at Laurie's office with [F.D.-H.] there and um, after sitting there for two and a half hours every time it—he was forced to say things that he—that he wasn't volunteering to say. So you know I of course knew where the case was gonna go next cause I knew you know the case wasn't over even though that case had been dismissed so I got to know [J.D.] over the years uh, since then and he's gone into great detail that—that's – that he's actually overcome, but there's still a very tragic and he just wanted the court to know that when I went to Natchitoches to meet him back last year again and you know one on one uh, the first thing he said was he walked in the room and he said hey Mr. Deason, I remember you and I apologize for all those crude things I told you in that attorney's office in Benton that day and he said you know she was making me say everything you know or she made me agree to everything before I got in there. He says because she—I was afraid she'll either force me to lay on the floor and not sleep in the bed or she wouldn't allow me to eat food.

Based on the record, J.D. has the opportunity for a normal life with his new adoptive parents. Not only is this in J.D.'s best interest, but it would be a detriment to J.D.'s future to overturn such a ruling from the district court.

### CONCLUSION

Considering the foregoing, we affirm the district court's judgment terminating the parental rights of F.D.-H. as to her minor child J.D. No costs are assessed in this appeal.

**AFFIRMED.**

18